1365

Lurline NOISETTE, Respondent v. Bassem ISMAIL, B. G. Owens d/b/a Auto Refurbishing, Penn National Insurance Company, Aetna Casualty and Surety Company and Allstate Insurance Company, Defendants, of whom Penn National Insurance Company and Allstate Insurance Company are Appellants, and B. G. Owens d/b/a Auto Refurbishing is Respondent. Appeal of PENN NATIONAL INSURANCE COMPANY and Allstate Insurance Company.

(384 S. E. (2d) 310)

Court of Appeals

*Stephen E. Darling,* and *Bert G. Utsey, III,* both of *Sinkler & Boyd;* and *David M. Collins,* of *Buist, Moore, Smythe & McGee,* Charleston, *for appellants.*

*Arnold S. Goodstein,* and *Mary A. Marwick,* both of *Goodstein & Goodstein,* Summerville; *Peggy M. Chandler* and *Mary Duncan Shahid,* both of *Belk, Howard, Cobb & Chandler,* Charleston, *for respondents.*

*Jon Austen,* of *Wise & Cole,* Charleston, *for defendants.*

Heard April 19, 1989.

Decided July 3, 1989.

GOOLSBY, Judge:

This declaratory judgment action brought by Lurline Noisette arises out of an automobile accident on February 14, 1982, involving a car in which Noisette rode as a passenger and a car driven by Bassem Ismail and owned by B. G. Owens, doing business as Auto Refurbishing. Noisette obtained a $60,000 judgment against Ismail in an earlier action brought on February 15, 1983. Noisette now seeks a declaratory judgment concerning the question of whether Pennsylvania National Mutual Casualty Insurance Company ("Penn National") and Allstate Insurance Company ("Allstate") provided garage liability insurance coverage to Owens at the time of the accident and, if so, the question of whether the coverage embraced the accident involving Noisette and Ismail. Owens filed, so far as is pertinent here,

a cross-complaint against both Penn National and Allstate for breach of contract.

The trial court held both insurance companies owed coverage to Owens at the time of the accident and held Penn National primarily liable and Allstate secondarily liable to Noisette for the judgment obtained by Noisette against Ismail. It also ordered Penn National to pay Owens $8,000 in attorney fees "for the cost of Owens' defense" of Noisette's action against Ismail. Both Penn National and Allstate appeal. We affirm in part, vacate in part, reverse in part, and remand.

## I.
## SCOPE OF REVIEW

Before addressing the merits of this appeal, we must first determine the proper scope of our review. Penn National and Allstate argue this is an equity action and, therefore, we should review the decision of the trial court to see if it is supported by the preponderance of the evidence. Noisette and Owens, however, contend this is a law case and, consequently, we must affirm the trial court if there is any evidence that reasonably supports its decision. *Townes Associates, Ltd. v. City of Greenville,* 266 S. C. 81, 221 S. E. (2d) 773 (1976).

A declaratory judgment action is like a chameleon. Its color is determined by its background, *i.e.,* the underlying action. *See Jacobs v. Service Merchandise Co.,* 297 S. C. 123, 375 S. E. (2d) 1 (Ct. App. 1988) (the character of a declaratory judgment action is determined by the main purpose of the complaint); *cf., e.g., DesPortes v. DesPortes,* 157 S. C. 407, 154 S. E. 426 (1930) (equity may entertain an action to construe a will under the Uniform Declaratory Judgments Act); *Jacobs v. Service Merchandise Co., supra* (a declaratory judgment action to determine the parties' rights under a written easement agreement is an action at law). An action for a declaratory judgment is a statutory action. 26 C. J. S. *Declaratory Judgments* § 104 at 234 (1956); *see* S. C. CODE ANN. §§ 15-53-10 *et seq.* (1976) (statutes conferring power on courts of record to grant declaratory judgment); Doernberg and Mushlin, *The Trojan Horse: How the Declaratory Judgment Act Created a Cause of Action and Ex-*

*panded Federal Jurisdiction While the Supreme Court Wasn't Looking*, 36 UCLA L. Rev. 529, 583 (1989) ("Beyond question, the [Declaratory Judgment] Act created a cause of action...."). Unless the cause of action and the relief sought in a declaratory judgment action are distinctly equitable, the action will be considered one at law.[1] *See Laub v. Wills*, 72 Ohio App. 496, 53 N. E. (2d) 530, 533 (1943) (an action for a declaratory judgment "is an action at law unless the allegations of the petition or other pleadings ... state a cause of action such as was recognized as an equitable action before the adoption of the Code of Civil Procedure...."); 22A Am. Jur. (2d) *Declaratory Judgments* § 2 at 671 (1988) ("Insofar ... as the right to have declarations made is distinctly granted by statute, it has been said that it would seem out of place not to consider the right a legal one even though it may at the same time, in some instances, be in the nature of those heretofore denominated 'equitable.' "); 26 C J. S., *supra* § 105 at 236 ("Declaratory relief may take on the color of either equity or law, depending on the issue presented."); 22A Am. Jur. (2d), *supra* § 4 at 627 ("[D]eclaratory relief was unknown at common law...."); 26 C. J. S., *supra* § 105 at 235 ("[A]n action for a declaratory judgment is not a suit in equity...."); *cf. Newberry Mills, Inc. v. Dawkins*, 259 S. C. 7, 190 S. E. (2d) 503 (1972) (an action brought pursuant to statutes permitting a taxpayer to contest the validity of a tax is an action at law); *Murphy v. Valk*, 30 S. C. 262, 267, 9 S. E. 101, 103 (1889) ("The law as to the mechanic's lien is purely statutory, and therefore in that sense the rights given by it may be called legal....").

Here, the underlying action neither alleges an equitable cause of action nor seeks equitable relief. As we noted at the beginning, Noisette's complaint merely seeks a declaration regarding whether Penn National and Allstate provided Owens certain insurance coverage at a particular time and whether any such coverage embraced a particular accident.

---

[1] The Declaratory Judgments Act does not create any new or substantive right but merely authorizes an action to establish a right. Before such an action may be brought, there must first be an actual controversy. *Power v. McNair*, 255 S. C. 150, 177 S. E. (2d) 551 (1970).

We therefore hold that Noisette's action for declaratory judgment is an action at law. *See Felton v. Chandler*, 201 Ga. 347, 39 S. E. (2d) 654 (1946) (wherein a declaratory judgment action held to be one at law since the prayer for relief did not seek injunctive or other equitable relief and the petition's allegations did not make out a case for equitable relief).

## II.
## PENN NATIONAL'S APPEAL

Penn National contends the trial court erred in finding that it provided coverage to Owens at the time of the accident, that the amount of the coverage was $100,000, that it is bound by the judgment obtained by Noisette in her action against Ismail, and that it, and not Allstate, provided primary coverage for the accident. Penn National also challenges the trial court's award of attorney fees to Owens.

### A.

We address first Penn National's argument that the trial court erred in finding that Penn National provided coverage to Owens at the time of the accident.

In reviewing this finding, we must view the evidence and all its reasonable inferences in the light least favorable to Penn National, the losing party below. *Doremus v. Atlantic Coast Line R. Co.*, 242 S. C. 123, 130 S. E. (2d) 370 (1963); *Sweat v. Crawford*, 292 S. C. 324, 356 S E. (2d) 147 (Ct. App. 1987).

Penn National first points to the absence of any insurance application, policy, binder, or other written record indicating either that Owens was its insured at the time of the accident or that it had received a premium payment from Owens for the insurance. The absence of any such written record, however, does not doom the trial court's finding of coverage.

According to the evidence, on May 1, 1975, Penn National and the Bulwinkle Agency, a general agent for several insurance companies, entered into an agency agreement. By the agreement, Penn National authorized Bulwinkle "to receive and accept proposals for insurance including binding authority, covering such ... risks as [Penn National] may ...

authorize to be insured." Garage liability is a risk Penn National had authorized Bulwinkle to insure. On November 20, 1981, Owens went to Bulwinkle, made application for garage liability insurance coverage in the amount of $100,000, and paid Bulwinkle $200 "to put a policy in[to] effect." Rebecca Funk, Bulwinkle's office manager and vice-president, wrote Owens a receipt and handed it to him. She told Owens that Penn National insured him from that "moment on." Owens walked out of Bulwinkle's "thinking [he] was insured."

We think the evidence just summarized is sufficient to support the trial court's finding that Penn National was obligated to provide garage liability coverage to Owens on the date of the accident. The evidence shows quite clearly that Penn National's general agent, Bulwinkle, issued Owens an oral binder and accepted a premium charge from him. At least in the case of automobile insurance, a binder may be given orally and "may be evidenced by such things as a receipt for premiums tendered to an agent who had the apparent authority to bind the insurance company." 7 Am. Jur. (2d) *Automobile Insurance* § 5 at 451-52 (1980).

But Penn National questions whether, as the trial court found, Bulwinkle had the apparent authority to bind it to a garage liability insurance contract on November 20, 1981, the day Owens went to Bulwinkle to buy the insurance.

Penn National claims it had divested Bulwinkle of all authority to write new business on its behalf before November 20, 1981, and had twice sent Bulwinkle letters instructing Bulwinkle not to bind it to any more new business until further notice.

The letters, however, expressly allowed Bulwinkle to make changes in existing policies. Moreover, Penn National did not terminate its agency relationship with Bulwinkle until June 27, 1983, over 15 months after Owens' vehicle was involved in the accident with Noisette.

The restriction Penn National attempted to place on Bulwinkle's authority to bind it to new business did not relieve Penn National from possible liability on the policy Bulwinkle sold Owens. As one well-respected treatise observes:

[A general] agent's authority is determined by the nature of his business, and is prima facie coextensive with his employment, as he has the right to do not only what is customary in obtaining business, but whatever is reasonably incidental thereto. Those dealing with such agent without notice of restrictions upon his authority have a right to presume that his authority is coextensive with its apparent scope, and as broad as his title indicates.

One seeking insurance from a general agent is not bound to inquire as to the precise instructions he has received from his company. The restrictions and limitations existing upon the authority of a general agent as between such agent and the company are not binding upon policyholders in their dealings with such agent, in the absence of knowledge of [sic] their part of such limitations. Thus, a limitation upon the authority of a general agent, having power to make contracts of insurance, would not relieve the insurer from liability on a policy issued by such agent, though in violation of the limitation, where the insured had neither actual nor constructive notice of such limitation. . . .

\* \* \* \* \*

J. APPLEMAN AND J. APPLEMAN, INSURANCE LAW AND PRACTICE § 8693 at 259-61 (1981); *Baker v. St. Paul Fire & Marine Insurance Co.*, 427 S. W. (2d) 281 (Mo. Ct. App. 1968).

Penn National selected Bulwinkle to act as its agent. Although Penn National later attempted to limit Bulwinkle's authority to bind it to new contracts, Penn National did nothing, so far as the record shows, to give notice to the public that Bulwinkle's authority was so limited.

Also, there was nothing about the application process that would have led Owens or anyone else to believe Bulwinkle did not have the authority to enter into a contract of insurance binding upon Penn National.

Clearly, Owens believed Bulwinkle had the authority to bind Penn National. He also relied on the appearance of such authority to his detriment and would suffer loss if the transaction executed by Penn National's agent did not bind it.

We therefore affirm the trial court's finding that Penn National had clothed Bulwinkle with the apparent authority to act on its behalf. *Hutson v. Continental Assurance Co.*, 269 S. C. 322, 237 S. E. (2d) 375 (1977); *McPherson v. McLendon*, 221 So. (2d) 75 (Miss. 1969).

### B.

Penn National next contends the trial court erred in finding that Owens' garage liability insurance policy provided coverage in the amount of $100,000 because Owens failed to notify Penn National of the accident and because any coverage it provided Owens was limited to $15,000.

### 1.

We find no merit to Penn National's claim that Owens did not notify it of the accident and of the action brought by Noisette against Ismail.

Owens notified Bulwinkle of the accident on February 15, 1982, the day following the accident. Owens, who was not a party to Noisette's action against Ismail, did not forward any suit papers to Penn National. Only when Noisette's attorney notified Penn National of the action on January 11, 1984, one day before the trial in the action began, did Penn National learn of Noisette's suit against Ismail. Penn National did not attend the trial or otherwise appear in the action.

Because Bulwinkle was still Penn National's agent on the date Owens notified Bulwinkle of the accident, Owens' notice to Bulwinkle constituted notice to Penn National. *See Rogers v. Atlantic Life Insurance Co.*, 135 S. C. 89, 133 S. E. 215 (1926) (the knowledge of an insurance agent acquired within the scope of his agency is imputable to the insurance company).

When Owens notified Bulwinkle of the accident, he acted, as it turned out, in accordance with the notice requirements of the only Penn National garage policy in evidence, the policy issued by Penn National to a third party and stranger to this suit, James Woods. The language of the Woods' policy places the duty upon the insured "[to] promptly notify us *or our agent*" of an accident. [Emphasis added.]

As to Owens' failure to immediately notify Penn National

of the action brought by Noisette against Ismail and to forward Penn National Noisette's suit papers, Penn National completely failed to demonstrate, as it was required to do, under the circumstances, that Owens' noncompliance with any policy provision as to notice of suit resulted in it being substantially prejudiced. *See Factory Mutual Liability Insurance Co. v. Kennedy*, 256 S. C. 376, 182 S. E. (2d) 727 (1971) (in an action affecting the rights of innocent third parties the failure of the insured to comply with a policy's provisions as to notice and forwarding suit papers will not bar recovery unless the insurer shows that the failure resulted in substantial prejudice to its rights); *cf. Merit Insurance Co. v. Koza*, 274 S. C. 362, 264 S. E. (2d) 146 (1980) (affirming the trial court's direction of a verdict and holding that prejudice was clearly established where the insured failed to comply with the policy provision requiring the insured to forward the suit papers to the insurer).

Indeed, Penn National cannot be heard to claim prejudice. Owens' prompt notice to Penn National's agent of the accident afforded Penn National more than enough time to investigate the accident, to discover the various issues associated with it, and to confer with Owens about his knowledge of the accident and about his responsibilities under the policy; but, as the evidence shows, Penn National did nothing. *See Home Indemnity Co. v. State Farm Mutual Automobile Insurance Co.*, 64 A. D. (2d) 212, 409 N. Y. S. (2d) 673 (1978) (where the insurer had notice of the accident shortly after it occurred and had ample time to investigate the accident, the insured's failure to give the insurer timely notice of the commencement of the action did not absolve the insurer from its obligation to defend and indemnify the insured).

### 2.

We also find no merit to Penn National's argument that Owens' coverage is limited to $15,000.

Sometime after Owens reported the accident, Funk gave Owens her business card. She wrote on the back of the card a Penn National policy number. The number, however, represented the garage liability insurance policy issued by Penn National to James Woods. The latter's policy provides

liability coverage only up to $15,000.

Penn National maintains the amount of any coverage provided by it to Owens must be determined by reference to Woods' policy since it is the policy number Owens believed represented his policy and since Penn National never issued an actual policy to Owens.

Although Owens, based upon Funk's representations, may have believed his Penn National policy number was the number reflected on Woods' policy, his belief in that regard has no bearing at all on the amount of insurance coverage Owens actually contracted for when he went to Bulwinkle.

The evidence shows, and the trial court found, Owens contracted with Penn National for it to provide coverage in the amount of $100,000, and not $15,000.

When Owens went to Bulwinkle to buy garage liability insurance, he told Funk he wanted coverage identical to that provided by Allstate. Owens' Allstate policy, the record shows, contained a $100,000 limitation for any one accident or loss.

### C.

Penn National next contends the trial court erred in holding that Penn National is bound by the judgment obtained by Noisette in her action against Ismail, an action concerned only with the question of Ismail's liability.

Noisette's complaint in the present action asks the court to declare that "Penn [National] had issued a policy of insurance covering the ... accident [caused by Ismail]." Paragraphs 4 and 5 of Noisette's complaint affirmatively allege Owens was the owner of a 1974 Toyota automobile and Ismail was operating the Toyota with Owens' permission at the time of the accident. Owens' answer admits the allegations of these two paragraphs, while Penn National's answer denies them due to a lack of sufficient information to form a belief concerning their truth. *Cf.* 71 C. J. S. *Pleading* § 160 at 335 (1951) ("An admission in the ... answer of one defendant is not conclusive on the other defendants....").

The Penn National garage policy in evidence extended liability coverage only to named insureds and certain permissive users of named insureds.

The trial court found as a fact that Ismail was driving an

automobile owned by Owens when he collided with Noisette; however, it made no findings of fact regarding the issue of whether Ismail was operating the automobile with Owens' permission, an issue clearly raised by the pleadings. Even so, the trial court concluded as a matter of law that Penn National is primarily liable for the damages recovered by Noisette in her action against Ismail.

Because the trial court made no findings of fact on the issue of whether Ismail was a permissive user of Owens' automobile at the time of the accident in question, a matter which, notwithstanding Penn National's claim to the contrary, Noisette insists in her brief before this court that she proved, we vacate the judgment that Penn National is liable for the damages recovered by Noisette in her action against Ismail and remand the issue for the trial court's further consideration and for it to make specific findings of fact regarding it. *See* S. C. R. CIV. P. 52(a) ("In all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon...."); 5A J. MOORE AND J. LUCAS, MOORE'S FEDERAL PRACTICE ¶52.06[2] at 52-153 (1989) ("Where the trial court fails ... to find on a material issue and an appeal is taken, the appellate court will normally vacate the judgment and remand the action for appropriate findings to be made.")

### D.

Penn National next contends the trial court erred in holding that it and not Allstate provided the primary garage liability coverage to Owens at the time of the accident.

Because we hold in Part III below that Allstate did not provide any garage liability insurance to Owens on the date of the accident, we need not address this argument.

### E.

Penn National next challenges the decision by the trial court to award Owens "$8,000 in attorney fees for the costs of Owens' defense of [the action brought by Noisette against Ismail]."

## 1.

The only attack Penn National directs to the trial court's decision to award Owens attorney fees in some amount is its contention that it "had no timely notice" of the earlier suit. This contention, which we dealt with above, has no merit.

Again, Penn National received timely notice of the accident when Owens reported the accident to Penn National's agent and Penn National failed to demonstrate it was substantially prejudiced by Owens' failure to send it Noisette's suit papers.

Furthermore, the record does not reflect that Owens, who was never in possession of the policy and was under the impression, after he reported the accident to Bulwinkle, that Penn National would handle the matter, ever knew or was informed that he was required to send the suit papers to Penn National. *See* J. APPLEMAN AND J. APPLEMAN, *supra* § 4740 at 109-10 ("The insured's duty to give notice of suit and to forward ... suit papers, is governed by the same rules applicable to his duty to give prompt notice of the accident."); *Id.* § 4741 at 134-35 ("[W]here the insured was not shown to have been furnished with any writing from which she could have learned of the notice provision the insured's failure to give timely notice would not relieve the insurer from liability under the policy.").

## 2.

Penn National next contends the trial court abused its discretion in awarding Owens $8,000 in attorney fees for having to defend Noisette's action against Ismail, contending the award is excessive and not supported by the evidence.

The only evidence before the trial court on the issue of attorney fees attributable to Owens' defense of the original action is the following:

Q: [By Noisette's attorney] When did you retain independent counsel?

A: [I]n 1983....

Q: And then you retained [an attorney] to represent you?

A: Yes, sir. But I talked to him on many occasions concerning this prior to that. He has been carrying this thing around in a briefcase for five and a half years.

. . . .

Q: [By Owens' attorney] And you hired our services?

A: Absolutely.

Q: And you agreed to pay us $100 per hour for that defense?

A: Yes, Sir.

This evidence falls far short of that required to base an award of attorney fees of $8,000, even considering the finding by the trial court regarding the professional standing of Owens' attorney.

Because Owens offered no proof of the specific time his attorney spent in defending the action Noisette brought against Ismail, an action in which Owens was not a named party, we must determine whether the amount awarded is reasonable. *See Hodge v. First Federal Savings & Loan Association of Spartanburg*, 267 S. C. 270, 227 S. E. (2d) 310 (1976) (where the question of attorney fees is submitted without proof of the specific time involved and the value thereof, the question resolves itself into one of reasonableness). This, however, we cannot do on the record before us, particularly since it does not reflect the nature and extent of the services rendered by Owens' attorney in Noisette's action against Ismail, the complexity of the issues involved with the case, and the beneficial results obtained for Owens in the action. *See Baron Data Sysems, Inc. v. Loter*, 297 S. C. 382, 377 S. E. (2d) 296 (1989) (listing the factors to be considered in determining whether an attorney fees award is reasonable); *cf. Freeman v. A. & M. Mobile Home Sales, Inc.*, 293 S. C. 255, 359 S. E. (2d) 532 (Ct. App. 1987) (upholding an attorney fees award as reasonable, considering the attorney's professional standing, the nature and extent of the services rendered, the complexity of the issues involved with the case, and the beneficial results obtained by the party).

We therefore vacate the attorney fees award and remand the question for redetermination. *Sunrise Savings & Loan Association v. Mariner's Cay Development Corp.*, 295 S. C. 208, 367 S. E. (2d) 696 (1988). As in the last cited case, it will

be necessary, under the circumstances, for the trial court "to take evidence on the reasonableness of the fees." *Id.* at 212, 367 S. E. (2d) at 698.

## III.
## ALLSTATE'S APPEAL

The dispositive issue in Allstate's appeal concerns the question of whether the trial court erred in finding that Allstate had failed to prove it cancelled the garage liability policy it had issued to Owens.[2]

The trial court concluded that Allstate did not prove the policy had been cancelled because Allstate "failed to present conclusive evidence that it sent notice of cancellation to Owens" and it "could neither prove that it mailed nor that Owens received notice of cancellation. . . ." In reaching this conclusion, the trial court, as we read its order, relied solely upon the fact that neither Allstate nor Owens could produce an actual copy of the notice of cancellation that Allstate claimed it sent to Owens.

Here, the trial court's findings of fact have the same force and effect as a jury verdict unless it committed some error of law leading it to an erroneous conclusion or unless the evidence is reasonably susceptible of the opposite conclusion only. *Midland Guardian Co. v. Thacker,* 280 S. C. 563, 314 S. E. (2d) 26 (Ct. App. 1984).

Cancellation of an insurance policy must be proved by a preponderance of the evidence. *Edens v. South Carolina Farm Bureau Mutual Insurance Co.,* 279 S. C. 377, 308 S. E. (2d) 670 (1983). There is, however, no requirement under South Carolina law that the actual notice-of-cancellation form be produced at trial, as the trial judge appears to have believed. Production of the actual cancella-

---

[2] The question of cancellation appears to have been tried by implied consent of the parties, there being no express allegation by Allstate in its amended answer that it had cancelled Owens' policy. *See* S. C. R. CIV. P. 15(b) ("When issues not raised by the pleadings are tried by . . . implied consent of the parties, they shall be treated in all respects as if they had been raised·in the pleadings.") The trial court states in its order that Allstate in its answer to the second amended complaint alleged the policy was cancelled before the date of the accident. *Cf. Id.* ("In the event the Court should try issues not raised by the pleadings, it shall state in the record all such issues tried and the reason therefor.")

tion notice is not the only competent way by which an insurer can prove it mailed a notice of cancellation to an insured.

Allstate introduced evidence that Owens' name appeared on a computer-generated list of names of insureds whose policies were being cancelled for nonpayment of premiums and that, under its normal internal procedures, everyone whose name appeared on the list would be mailed a computer-generated notice of cancellation.

Neither Owens nor Noisette, however, offered any evidence refuting Allstate's evidence that it had cancelled the policy. Indeed, the only reasonable inference to be drawn from Owens' testimony is that he intentionally allowed the policy to lapse, that he believed the Allstate policy had been cancelled several months prior to the accident, and that the only reason he went to Bulwinkle in the first place was to buy insurance to replace the Allstate policy.[3]

The fact, then, that neither Allstate nor Owens was able to produce the actual cancellation notice, without more, does not warrant the conclusion that the notice was neither mailed by Allstate nor received by Owens.

Because the evidence in this case is only susceptible of the conclusion that Allstate sent Owens a notice of cancellation and that Owens received the notice, the trial court erred in holding that Allstate provided garage liability coverage to Owens on the date of Noisette's and Ismail's accident.[4]

---

[3] We note Owens admitted in response to Allstate's Requests for Admissions he had received the notice of cancellation. Allstate, however, never put in evidence, so far as the record reflects, its requests for admissions and Owens' responses thereto; therefore, we have not considered Owens' responses to Allstate's requests for admissions in reaching our result. *See* 4A J. MOORE AND J. LUCAS, MOORE'S FEDERAL PRACTICE ¶36.05[4] at 36-61 (1988) ("If admissions pursuant to the rule ... are to be relied on at the trial, the request and the answers ... should be put in evidence at the trial.")

We also note but do not consider Noisette's acknowledgment in her brief that a "cancellation notice [was] sent to Owens by Allstate" in June, 1981, and that "Owens received [the] notice."

[4] Noisette in her brief before this court raises for the very first time the argument that the notice of cancellation received by Owens did not comply with Section 38-37-1450 of the South Carolina Code of Laws (1976), a statute now repealed by implication. 65 STAT. Act No. 155 at 385 (1987); *see* S. C. CODE ANN. § 38-77-120 (1976) (revised 1989) (new statute relating to the

Affirmed in part, vacated in part, reversed in part, and remanded.

GARDNER and CURETON, JJ., concur.

requirements of notice of cancellation for a policy of automobile insurance). In any case, Section 38-37-1450 did not apply to garage liablity insurance. *See* S. C. CODE ANN. § 38-37-1410(1)(b)(3), *repealed by implication,* 65 STAT. Act No. 155 at 385 (1987) (statute prescribing that Article 19, the article in which Section 38-37-1450 appeared, did not apply "to any policy covering garage ... operation hazards").